Good morning, members of the panel. My name is Richard Greener. I'm here on behalf of Western Mortgage, the appellant in this particular matter, and I would like to reserve five minutes for rebuttal, if I may. All right. There is a clock there, but I'll also try to—you have a clock right there, and I'll also try to help you. I'll keep an eye on that. I'd like to give you an idea as to the direction I'm going to head this morning, if I may, because I'm first going to take up what we believe to be an erroneous decision by the lower court, that the statute of limitations barred the claims that Western has in this case. Is that dependent upon the panel agreeing with you that the amendments in, what, 2010? Yes, August 3, 2010. Restarted—retriggered the limitations period? In part. That's one of our arguments, Your Honor. We also have the argument that we've made in our briefing that if you look at the language of the LSA amendment and the loan sale agreement of May 10, 2007, they both deal with the same subject matter. They are, if you will, documents that have a very easy way of being read together, and our position, based upon the case law we cited for you, the Silver Syndicate case in particular is—and I'll get to the point here—is that what we have, in essence, too, is essentially a new contract that is formed by virtue of the loan sale agreement, which we'll refer to as the LSA, and the amendment to the loan sale agreement. And I'd like to address that as part of it. So to answer your question directly, we think it's both. We think it was restarted by the LSA amendment, but we also believe that what we have is essentially based upon the cases, again, that we've cited—Silver Syndicate, Opportunity, LLC, the one that we just delivered to the Court, I believe, on Friday, the Publin v. C.H. Robins in 2000. This is a 1986 case? The one we sent to you on Friday is a 2017 case out of California. Oh, okay. And it's—I may be mispronouncing this—P-O-U-B-L-O-N v. C.H. Robinson. And these cases, we believe, stand for the proposition that where you have the commonality between two contracts, and Silver Syndicate gets into that very directly, because it dealt with a 1942 and a 1943 contract, that what you could conclude—and we believe this would be the correct analysis—is that you have a new contract fully formed between the two agreements, the original loan sale agreement and the LSA amendment. And so as a consequence, we think that the lower court simply erred because the statute of limitations on that basis alone should have not began to run until August 3, 2010. And in addition, we did argue also that the LSA amendment, in essence, for lack of a better way of putting it, rather inartful perhaps, but restarted the statute of limitations. And so what I'd like to do is talk to you about some specifics as to why we believe that's the case. I think that actually is some of the confusion in the case in the district court as well, this notion that you're restarting the statute. I mean, the question is, you have a contract with the statute of limitations, contract number one. Then you have contract number two. And I have a real question, and you probably will answer it in your discussion, you know, whether this Idaho statute that keeps being referenced here having to do with the debtor has anything to do with this case, or whether you're really just looking to see is, do you have a new contract, and what is the statute of limitations for that contract? So that's the construct I'm thinking about, and I'd appreciate it in your discussion if you would factor that in. I will do my level best to follow your commentary. And I think, in essence, if I understood you correctly, that that's essentially what we are arguing here. And that is, if you, and one of the major reasons why is because just of the, again, the common subject matter of the contracts, the same parties, and the same, essentially the same transaction. And then the language of the loan, of the amendment to the loan sale agreement, the August 3, 2010 document. And this is significant, we think, that shows that they are, they really can be read together. For starters, that document, members of the court, is entitled Amendment to Loan Sale Agreement. It's referring back to the May 10, 2007 agreement. That tells us something, I think, that's very significant. Well, that could go both ways, couldn't it? Because an amendment may not even be another contract. It's just an amendment to an existing contract, which wouldn't start a new statute of limitations. So that doesn't get you, I mean, it just depends on what you mean by an amendment. Which brings us back to the whole question is, is this a sufficiently different contract to be read as a new contract, restarting the statute? Well, we think it can be. And I'll tell you exactly why. If you look at what we have in the LSA amendment, you have a new promise between the parties, promises given each way. About price. Well, it's about price. And it's significant, because what has happened here, and there's certainly valid consideration for this new contract. And incidentally, to further answer your question, we think that the court could conclude that the amendment to the LSA agreement is actually a stand-alone agreement. Because what they've done here, members of the court, basically is this. Key Bank has received the certainty that it's going to get $1,750,000 incidental in the transaction to give up any right to the proceeds from this litigation referred to in the record as the Ouse litigation. Now, the Ouse litigation was like any other case that involves a large crop loss claim with product liability claims. It was not a certainty at that time. And we suggest to you that Key Bank was bargaining, saying, we'd like to take the cash now. We're not going to wait. And it's a risk assessment that they made, right? That's what we can, they had to have, because otherwise they would have waited. Now, on the other side of the coin, we have Western that is confronted with this, I guess, ability to gamble, if you will, on how the Ouse claim is going to turn out. And pay, in addition to gambling, the sum right then of $1,750,000. So these are two, it's not just a change in price, we don't believe. These are two new promises that are very significant and they certainly present valid consideration for what could be viewed here as a new stand-alone contract. There's more to this, too, though, that we think is significant. And we've cited the case law for you, and actually the case that we just sent to you, the one that I'm having a hard time perhaps pronouncing, Poublon v. C.H. Robinson. They stand for the proposition, and the other cases cited do as well, that when there's just even a reference to another contract... But you're dealing with the word incorporated, why don't you just say it? Yes, that's right. Why don't you just come out and say it? Does the word incorporate, how far does that take you, right? We think it takes you all the way to this extent that the original loan LSA of May 10, 2007, was incorporated by reference with particularity into this document and all the warranties flowed through and were still, you know, binding. If the warranties are that important, why didn't they just repeat the warranties and make it a totally new contract? I can't answer that because I didn't draft the document, and I will tell you, though, that I believe that they thought that's what they were doing. But isn't Poublon different, I mean, the one that you're citing now? I mean, that was an incorporation, I believe, of arbitration rules, which would have been impossible to, I mean, how are you going to do that? Whereas this would have been quite easy to incorporate what they thought was important, the warranty. Well, all I can tell you, honestly, and I think Poublon has some interesting language that is consistent with what we're arguing here, but in addition to that, we think that it's significant that as far as the intent of the parties and the amendment, the LSA being a standalone document, if you look at Recital A, and that's where we have the reference, that's where they have the reference to the incorporation by reference, and of course that says that a copy of the LSA agreement is an extra to and incorporated herein for greater certainty. I mean, why were they saying for greater certainty? In addition, there's a reference in that particular paragraph, Paragraph A, to the very critical Exhibit C to the Loan Sale Agreement. Exhibit C is critical, members of the Court, because that is the document that contains the assignment of the tort claim from the Roy Young, Nature's Best, and the other Young entities, and the particularity of Roy Young and Nature's Best, of course, are the ones that we're concerned with here. But Roy Young and Nature's Best are particularly and specifically called out in Exhibit C, and there's a very direct statement, and it's reiterated by incorporating by reference here, that the interest in the oust litigation owned by Mr. Roy Young and Nature's Best are being assigned and transferred to Key Bank. So we think that the language certainly reflects, and the promise is given, that this is more than just a mirror. We're just changing the monetary amount that's being paid. They could have done that by just saying, we're changing the monetary amount that's being paid and had a two-line additional document. So I hope I've answered your question, but we think when we get to the end of my discussion here, we can stand before you and say that we have a new agreement that should be able to be enforced. It contained the warranties that we think are very clearly established in the record before the Court, and in addition, that the Court could conclude that the LSA amendment is a stand-alone contract. I'd like to turn now for just a minute to... Did you, just so you know your time, you have three minutes and 38 seconds, so I didn't know if you wanted to reserve. That's all I have left? Yes. I better reserve. I'm going to try to reserve three minutes. All right. I would like to get into, for just a minute, Section 5-238, and thank you, Your Honor, for mentioning that to me. We also have argued that that specific Idaho statute certainly would operate by its clear language to extend the statute of limitations. Members of the Court, the lower court somehow disregarded the first sentence, really, of that particular statute. It says very clearly that you can have a new acknowledgment or promise of a new or continuing contract if it's in writing, signed by the parties. It goes on to an exception that says, but any payment can also extend the statute of limitations. Now, what the lower court said was that, well, what this means is that this only applies in a debtor-creditor relationship. We don't think that's the case at all. We think the clear language also operates to extend the statute of limitations, and I'll just say I'd like to have some time to talk about this, I hope, but if the statute of limitations is extended, we think it's proved in the record that we have a recessive contract that would entitle Western to recovery. Thank you, and I guess I have 2 minutes and 20 seconds left. Your Honors, may it please the Court, Brian Esler for KeyBank. Western's Mr. Tippett described these transactions as a home run. What they're coming here to ask you to do is convert that home run into a grand slam. Under Idaho law, there's a 5-year statute of limitations for bringing a breach of contract claim. A breach here, if there was one, occurred when KeyBank made these alleged representations and warranties that were not true in 2007. In 2007? Correct. At the closing, May 23rd. This is a preference to a question, so if you'll hold off on that. Apologize, Your Honor. In 2007, what was the status of the Oost-Yoost litigation? At that time, the Oost litigation was ongoing. It didn't settle, I believe, until 2012. Okay, it was still ongoing. It hadn't been resolved. At that point, it could have had a value of zero or much more than zero, correct? Correct. And that was understood between these 2 parties? I believe so, Your Honor. No question that the sum and substance of the agreement, as it pertained to the outcome or the proceeds of this litigation, that this was an asset that KeyBank owned and would be transferring under the LSA to Western, correct? I believe I have to explain a little bit, Your Honor, because in 2006, KeyBank releases Roy Young and Nature's Best. And in that release, it also releases its security interest with respect to those plaintiffs in the Oost litigation. Now, the Oost litigation doesn't just involve Nature's Best. It also involves Steve Young and his related companies. That security interest continued. So when we closed the deal on May 23, 2007, Western is getting a full enforceable security interest in whatever KeyBank still has, which at the time consists only of essentially Steve and his company's claims in the Oost litigation. So the release had occurred prior to the execution of the 07 agreement? Correct. And was there any further release or diminution in the value of that security interest after 2007? There wouldn't have, at least as far as KeyBank is aware, no. But of course, in 2007, May 15, 2007, KeyBank transfers its original loan files. This is before closing, a week before closing. Transfers its original loan files to Western. And as Mr. Tippett admitted about two months later when he settled, and remember, this entire transaction comes up in the context of litigation. KeyBank, after releasing Roy Young and Nature's Best, getting partially paid on the loans that are outstanding by them, then enters into litigation against Steve Young and his companies, which is why I would submit you don't see in the LSA any mention of Nature's Best, except in that one Exhibit C, number 7, when we give a factually correct description of the security interest we received, which was executed, as it says in Exhibit C, by Steve Young, by Roy Young, by Nature's Best, and by an entire cast of other entities. So was it your position that in no way, under no circumstance, did KeyBank transfer, under the original LSA, a security interest that it no longer had a security interest in? That would be correct, Your Honor. We couldn't transfer a security interest we didn't have. And we publicly filed, shortly after we entered into the agreement with Roy Young and Nature's Best, we publicly filed with the Idaho Secretary of State a UCC termination. And were you in negotiations then with Western, your client? Well, at that point, I don't know that there were any negotiations with Western. I don't believe it's part of the record. There could have been, there might not have been. At what point in time was Western told that there had been any modification or release of the litigation we've been talking about? Well, Your Honor, we file in 2006. This asks for a date. And I'm getting there. We file in 2006 the release. We then sue Steve Young and his related companies. Or I should say, KeyBank sues Steve Young and his related companies. Western intervened in that litigation because it owned other loans. We were, KeyBank was looking to have a receiver appointed over Steve Young's companies. Western intervenes to oppose that appointment of a receiver. And approximately nine months later, KeyBank and Western enter into the loan sale agreement. Now, there is nothing in the record talking about the Nature's Best release. There's no discussion of it, at least, that we can find in emails or anything else. But I think the record is very clear that the reason for that is we had released that. Western knew we had released that. The lawsuit in which it intervened doesn't list Nature's Best as a defendant. As any sophisticated lender would know, with a one-action rule, you have to name everybody on the loan. You don't just name some of the borrowers. So I would submit to you that the evidence is actually fairly clear that when it entered into this agreement in 2007, Western knew, or at least as a sophisticated lender should have known, that there was no Nature's Best interest being transferred. So then what happens in 2010, you have the price change? Correct. You have recital A, which incorporates the warranties, correct? Correct. I would say that we were not, to explain it most clearly, we couldn't warrant in 2010 assets that we sold in 2007. What does Exhibit C do? The only reason for attaching the LSA is to give greater certainty. What does Exhibit C do? Exhibit C simply lists all of the documents that we are transferring that underlie the loans and security interests. And remember, there is still — But he characterizes it as an assignment of tort claims regarding Nature's Best — Correct. — and Young. Is that true? It lists Nature's Best, Steve Young, Mackey, and about 20 other people, all of whom actually did sign that agreement. So when we're listing Exhibit C — or when we're listing, I should say, in Exhibit C, that assignment, all we're doing is correctly identifying it was executed by these people, which are the people who actually executed it in 2005 when the assignment was given. Do you think that's — is that all Exhibit C is doing, just listing? When it's referred to in the body of the LSA, don't you think that it was reasonable to assume that this was something that KeyBank owned at the time? Well — I mean, it may not have been deliberate. It may have just been a mistake on the part of the drafters. I mean, I'm saying that KeyBank deliberately did that. That's a different question. But the impression that's given by the language of the LSA when it refers to Exhibit C, doesn't that create the impression that this still was something that belonged to KeyBank? Well, Your Honor, it did still belong to KeyBank. And the reason it still belongs to KeyBank is because that assignment isn't just signed by Nature's Best. It's also signed by Steve Young and his related entities. That agreement indeed not only was enforceable, but was enforced by Western. That is the basis on which it settled with Western in August of 2007. So if it weren't for that assignment — if that assignment of commercial tort claims was no good, Western wouldn't have gotten anything out of the — out of its litigation other than what it may have received from other lenders. So that assignment is still good. The fact that we release one borrower under that assignment doesn't mean the remaining borrowers don't remain liable. And indeed, that was the basis on which Western collected an awful lot of money out of the oust settlement. I mean, so one way to look at it, though, is essentially — I mean, why would — why would this price have come up with? It's basically a risk assessment of where you are at that point, right? And I would submit to you, Your Honors — And if that's the case, then it's a new ballgame. I mean, it was — one thing was on the table in 2007. Now we're in 2010, and the price is tied to the whole transaction. So why isn't that — I mean, it looks to me like you just have a whole new contract, because you have the incorporation for greater certainty, which seems to me to go kind of against your position that it's just, well, we just, you know, we just threw it in there because that's what lawyers do. That's not what happened. If you actually look at what happens with respect to those negotiations — Yeah, but that's the question. And it — I'm sorry, Your Honor. I interrupted you. You see, that's my problem, is we're supposed to look at the contract, not, you know, if the contract — if I just looked at this contract and I didn't know anything about it, about past negotiations or reasons, you'd look at it. Well, is it an integrated contract? And does it apply as an integrated contract? You'd probably say, sure, sure. But now you're saying, well, but if you really knew what was going on — so my question is, why does that matter if you're looking at an integrated contract? Well, let me answer that in two ways, Your Honor. First off, this is called an amendment. It is not called an ovation, which is really what they're trying to argue for without saying the word, that somehow we abandoned all the previous contract and entered into a brand-new contract with none of the previous — with the previous contract being canceled. That's not what happened. We called it — the parties called it an amendment for a very good reason, because the only thing we were doing was amending the purchase price. But an amendment to a contract can be a brand-new contract. It seemed to me whether you call it an ovation or an amendment doesn't tell you what the contract documents mean, necessarily.  Well, Your Honor, I think the purpose of contract interpretation is to try to discern the intent of the parties. If the language is unambiguous, you just go on the language. If the language is at all ambiguous, you look at the circumstances. So where's the ambiguity here? I don't think there's any ambiguity. I think it was very clear that it was simply changing the purchase price from a contingent — we might get something, we might get nothing. It might be $60 million, it might be $0 to $1.75 million. KeyBank was willing to do that at the time. Western was willing to do that at the time. And as the facts show, it was a very good deal for Western. It paid $1.75 million, and it got a lot more when the House litigation settled. But at the time they're negotiating that 2010 amendment, it is undisputed that Western knew, had found our 2006 UCC filing, releasing Nature's Best. Tim Tippett knows about it, admits that he knows about it, by I think it was June 29th, 2010. Tippett works for whom? For Western. And when Mr. Tippett gets this information, he doesn't go to KeyBank and say, hold on a second, I thought I was getting a security interest from Nature's Best, and I just got a report from the Secretary of State that says that doesn't exist. I thought at some point, and please correct me if I'm wrong, there was a conversation between Tippett and someone from Western. And the person from Western said, these litigation proceeds, they're still in there, right? And Tippett said, yeah. Do I have that right? You do not, Your Honor. I think what you're referring to is exactly the email exchange that I'm referring to, which happens in 2010 between Tim Tippett and Lee Bean. And again, the sequence of Tim Tippett makes an offer saying, would you take a million dollars to just release your contingent liability, the contingent interest you still have in the oust litigation? Mr. Bean says no. Mr. Tippett then gets, from his own lawyers, a copy of the filing we did back in 2006 releasing Nature's Best. So at this point, Tim Tippett knows or should know there is no Nature's Best interest. We've actually publicly filed this with the Secretary of State. And again, his reaction is not, oh my gosh, you ripped me off. His reaction is, okay, instead of a million, would you take 1.75 million to release your interest in the oust litigation, which is what the parties ultimately did. I think there's, I'd like to refer to a different exchange than the one where they're bargaining about how much is going to get paid. I want to refer to the exchange when Tippett asks Bean, you know, what's going on? Do you still have this, are you still able to do this assignment? And Bean answers, I believe so. That's a different set of communication. That communication happens just after. I believe you'd see it as the next email exchange after Lee Bean responds back saying, yes, we'll accept your 1.75 million. Mr. Tippett then, knowing full well that he's seen the report from the Secretary of State that says there is no security interest. It's been released back in 2006. Emails back to Lee Bean and says, we expect that this also includes Nature's Best in all the young entities. And Lee Bean writes back, I believe so. What the court found below, and I think it was the correct result, is that Mr. Tippett could not, at that point, knowing full well about that release, rely on what Mr. Bean said. And there's a lot of reasons for that. The least of which is, this is three years after Mr. Bean, Key Bank, has transferred all of their loan files to Mr. Tippett. Mr. Tippett has the loan files to see what's in there. Key Bank doesn't. All they're negotiating about is reducing that liability, potential liability for Western, potential payment for Key Bank to a some certain. And at that time, Mr. Tippett knew about the release, could have asked about it, but he doesn't. You know, quite the contrary. He not only doesn't ask about it, but he asks with the implication that Nature's Best is still in there. You're saying that he did that even though he knew it wasn't in there? Exactly, Your Honor. And remember, in the context of what they're talking about, Nature's Best is still a litigant in the Ouse litigation. Although Key Bank has released any Nature's Best interest, the agreement is 50% of all of the proceeds. Nature's Best, Steve Young, Western, I'm sorry, Western was not a litigant in that. So the agreement is 50% of whatever is recovered there, regardless of who recovers it. So it is not that unusual that Mr. Bean might be saying, or I should say Mr. Tippett might be saying, we're talking about all the plaintiffs, right? Not just some of the plaintiffs. And all Mr. Bean is saying back is, yes, we are looking to release that entire interest. The contingent liability that we created in I think those are the, not only just the facts as they are, that is the showing that Judge Lodge looked at and said, you can't reasonably rely on a statement of opinion when you have all of the loan files in your own file drawers. You know this interest has been released. At that point, there's no reasonable reliance. There's no fraud by Mr. Bean in saying, I believe so. All Mr. Bean is saying is, yes, we are giving up all our interest. You pay us $1.75 million. You can keep whatever you end up collecting in the Ouse litigation from whatever plaintiff it may be. Thank you. I think you have about two minutes left. Do I get any extra time by any chance? Because I believe they went over. I know you have a lot to say, but we have a lot of briefing as well. So why don't you narrow it to the most important points. What I'd like to hit first is just that last issue that was being addressed before I talk about the breach of warranty claims. And it's in the excerpts of Record 269. That's the EBL exchange that you were chatting about earlier. And it's very clear that at that point, any reasonable person would do when he found out that there had perhaps been a UCC termination, pardon me, I don't know if I did, a UCC termination statement that had been filed. And so he sent an email, which would be the appropriate thing, to the vice president of the company that had been making these warranties that they owned and were transferring this security interest in the Ouse litigation owned by Nature's Best and Thanks, Lee. It's also anticipated that any young and young entity would also include Nature's Best, Tim. Vice President Bean writes back, I believe it anticipates all related entities and Nature's Best would be included. Now, we believe that where Judge Lodge addressed this particular exchange was when he unilaterally took on the fraud claim and ruled, even though that had not been argued by Key Bank in the motion for summary judgment. And we think that that was incorrect, that we'd never had a chance to respond, frankly, to the fraud claim because Key hadn't addressed it in their opening brief. Yet Judge Lodge took it upon himself to get into that area. He was talking about the fraud claim, though, and he wasn't talking about the breach of contract and the breach of warranty claims when he was addressing that. And so we think that under the circumstances and the case law that we cited to you, certainly where there's an express breach of warranty, the party that gets the warranty can rely upon that. And I've got to take issue with counsel in terms of their transfer of the house litigation interest held by Nature's Best and Roy Young in the LSA. And frankly, in discussing the reference to Exhibit C, that that triggers the whole inquiry. Because if you if you look at Section 1.1 of the LSA, it says very clearly that all of these interests are being transferred, and it makes reference there to Exhibit C. What does Exhibit C, Paragraph 7, say? Without qualification. An assignment of commercial tort claims, judgments and awards, security interest executed as of April 26, 2005 by Young and Young, and it goes on to list Roy M. Young and Nature's Best. These are all being transferred expressly and explicitly in Paragraph 7 of Exhibit C at that time. Now, it's interesting that counsel said, well, wait a minute. It still doesn't matter, because at that point in time, Key Bank had nothing to transfer. And they rely upon Paragraph 4.1.3. Paragraph 4.1.3 of the of the LSA specifically says that it is warranting that they have good title to the assets being transferred, that there's not been any prior assignment of the assets. And somehow, Key is arguing to you that that language, because they didn't actually have it, means that nothing was transferred. That argument's in their brief. We think that all of the warranties that are clearly set forth in the LSA that we believe were specific among them would be 1.1 that I just mentioned. Also, the 4.1.1, 4.1.2, and 4.1.3. Thank you. So we've evened things up. We've given you some additional time as well. And I think we have your argument quite well in mind, as well as the argument of Key Bank. It's a very lengthy litigation and relationship you've all had. And the case just argued is now submitted, Western Mortgage v. Key Bank. Thank you very much for your arguments. And we're adjourned for the morning.
judges: Hawkins, McKeown, Rothstein